FILED

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND-ODESSA DIVISION**

AUG 1 9 2010

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| **JEFFREY NEELY** | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **7:10-cv-00030-RAJ** |
| | § | |
| **PSEG TEXAS, LP AND PUBLIC** | § | |
| **SERVICE ENTERPRISE GROUP** | § | |
| **INCORPORATED** | § | |
| **Defendants.** | | |

## PLAINTIFF'S FIRST AMENDED COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

**Plaintiff JEFFREY NEELY ("Plaintiff")** files this First Amended Complaint and would respectfully show the Court as follows:

### PARTIES

1.    Plaintiff is an individual who currently resides in Midland County, Texas.

2.    **Defendant PSEG TEXAS, LP (PSEG Texas)** is a Delaware limited partnership which may be served with process through its registered agent, C T Corporation System, 350 N. St. Paul Street, Suite 2900, Dallas, Texas 75201-4234. **Defendant PUBLIC SERVICE ENTERPRISE GROUP INCORPORATED (PSEG)** is a foreign corporation that does not maintain a registered agent in the State of Texas although it conducts business in the State of Texas.  PSEG may be served through its Chairman of the Board, President, and Chief Executive Officer Ralph Izzo, Public Service Enterprise Group Incorporated, 80 Park Plaza, Newark, NJ 07102.  PSEG Texas and PSEG shall sometimes be referred to collectively as "PSEG" or "Defendant."

3.     This Court has federal question jurisdiction because the action arises under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f)(3), Title I of the Americans with Disabilities Act, 42 U.S.C. § 12117(a), and/or the Family and Medical Leave Act, 29 U.S.C. § 2617.

4.     Venue is proper in the U.S. District Court for the Western District of Texas, Midland-Odessa Division because the unlawful practices alleged below were committed therein.

EXHAUSTION OF ADMINISTRATIVE PROCEDURES

5.     Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC).  Plaintiff filed this suit within (90) days of receiving a Notice of Right to Sue from the Equal Employment Opportunity Commission.

CONDITIONS PRECEDENT

6.     All conditions precedent have been performed or have occurred.

FACTS

7.     Public Service Enterprise Group (PSEG) is a publicly traded diversified energy company headquartered in New Jersey.  It is one of the ten largest electric companies in the United States.  It has total annual revenues of approximately $13.3 billion, and approximately 10,500 employees.

8.     PSEG has three main subsidiaries: PSE&G, PSEG Power, and PSEG Energy Holdings.  PSEG Power is a major unregulated independent power producer with three main subsidiaries:  PSEG Fossil, PSEG Nuclear, and PSEG Energy Resources and Trade.  PSEG Fossil LLC operates PSEG Power's portfolio of natural gas, coal, and oil-

fired electric generating units and oversees PSEG Power's ownership interest in the Conemaugh and Keystone plants located in Pennsylvania.  PSEG operates a power plant in Odessa, Texas.

9.      Plaintiff began working for PSEG or its predecessor-in-interest on or about November 26, 2001.  At the time of Plaintiff's termination on May 15, 2009, he was a Control Room Operator.

10.     Prior to working for Defendant, Plaintiff was on active duty with the U.S. Navy from July 13, 1993, to December 12, 2001.  Plaintiff served as a nuclear machinist mate on two nuclear submarines.  (Plaintiff was on terminal leave the last month of his service so he actually started working for PSEG before his honorable discharge.)

11.     Plaintiff suffers from the following mental impairments: Major Depressive Disorder (Severe without Psychosis) and Generalized Anxiety Disorder.  Additionally, he exhibits symptoms of Obsessive Compulsive Disorder and Post Traumatic Stress Disorder.  Plaintiff's symptoms of anxiety and depression were well-known to plant management and his co-workers.

12.     Despite these mental impairments, Plaintiff was a dedicated, reliable, and competent employee for many years.

13.     Defendant restructured its corporate management in the spring of 2008. This created many problems for employees.  Plaintiff was having severe difficulties adjusting to the new corporate environment and expressed his concerns to management.

14.     One night on shift, Plant Manager Roy Sanchez handed out letters to all the employees stating each employee's pay raise and bonus for the year.

15.     During a conversation in Mr. Sanchez's office, Plaintiff broke down and told Mr. Sanchez that he was having problems.  One of the reasons for his problems was constant changes in the plant, and Plaintiff was not sure where he stood in the company anymore.  Mr. Sanchez assured Plaintiff that there was no need for him to be concerned because he was an excellent employee.

16.     Plant Operations Manager Lloyd Hughes also assured Plaintiff many times that he was an excellent employee.  Mr. Hughes was Plaintiff's second-level supervisor. As Operations Manager, Mr. Hughes reported to Mr. Sanchez, the Plant Manager.  Pedro Hernandez was Plaintiff's immediate supervisor.

17.     Despite their assurances, Plaintiff remained deeply troubled adjusting to the new structure.  He made his concerns and problems known to plant management and his co-workers.

18.     During October 2008, Plant Manager Roy Sanchez, who is Hispanic, stated that while he was working for the Huntsman plant, he was able to engineer a major turnaround in the hiring of Hispanic employees.  He had hired all Hispanics and replaced the majority of the workers there, thanks to his own doing.  Mr. Sanchez made these comments to Plaintiff along with at least one other employee.

19.     During the fall of 2008, Dominic DiBari, Director of PSEG Fossil, came from the New Jersey corporate headquarters to visit the plant and make a presentation.  In the days leading up to the meeting, Plaintiff began having anxiety about meeting Mr. DiBari because Plaintiff knew if he was asked about the plant that he would feel compelled to be honest with Mr. DiBari.

20.    Plaintiff talked to his shift supervisor Pedro Hernandez about it and asked Mr. Hernandez if he could use one of his sick days while Mr. DiBari was at the plant. Mr. Hernandez, who had served with Plaintiff in the Navy, chastised Plaintiff for having that thought and talked him out of using one of his sick days. (During a conversation with Operations Manager Lloyd Hughes in February 2009, Mr. Hughes told Plaintiff that he was aware of the situation dating back to the fall of 2008.)

21.    On or about February 5, 2009, while Plaintiff was in the control room, PSEG Fossil Director Dominic DiBari walked in behind Plaintiff and wanted to talk to him.  Several of Plaintiff's fellow operators and maintenance technicians were in the room, too.  Mr. DiBari sat a bottle of water down on the control board.  Mr. DiBari asked Plaintiff, "What do you think of PSEG and how we are doing now that we are taking over the plant?"

22.    Plaintiff replied, "Sir, if it's all the same to you, and please don't take offense at this, but if it's all the same to you; I am really uncomfortable having a conversation such as this and would rather not."

23.    Mr. DiBari asked Plaintiff why he felt this way and Plaintiff stated, "Simply put, sir, because every time I have a conversation with higher management I end up in trouble – especially if they don't know me because I can come off a bit harsh on occasion even though I never mean to so, if it's all the same, I am really not comfortable having this conversation and would really rather not."

24.    Mr. DiBari replied, "You must be kidding? You can't get in trouble just for having a conversation."  Plaintiff responded, "Trust me, jack, I'm probably already in trouble just for talking to you this much so again, if you don't mind, I'm very

uncomfortable having this conversation and would really rather not have it. I'm very good at what I do and no one will deny that so please just leave me alone to do my job. I don't want any problems."

25.     If not verbatim, the words stated have the same effect as the conversation that took place.

26.     This conversation went on for about fifteen minutes. Plaintiff was between a rock and a hard place. On the one hand, he was afraid to offend Mr. DiBari by stating his opinion. On the other hand, he was afraid to refuse to answer Mr. DiBari's questions. Mr. DiBari assured Plaintiff several times that he would not get in trouble for participating in the discussion.

27.     Finally, Plaintiff gave in and told Mr. DiBari what he thought about PSEG and how some things could be done better. Two of the items that Plaintiff mentioned were a rule that operators could not have coffee or other beverages in the control room and that a "stupid" red line was talked about being painted on the floor to demark the line between the horseshoe and the control room. (The horseshoe is the C-shaped desk area that serves as the control board for the plant. Plaintiff was stationed at the horseshoe.) Plaintiff subsequently learned that both of these ideas had originated with Mr. DiBari.

28.     Mr. DiBari changed the direction of the conversation and told Plaintiff that he should be doing something for the company at all times and that if he found himself with some "free bandwidth" then he should call Mr. Hughes and ask him if Plaintiff can do anything for the company. Plaintiff told him that it would probably be another day because he was sure to be in trouble for talking to Mr. DiBari. Again, Mr. DiBari assured Plaintiff there would be no trouble, and Mr. DiBari left the control room.

29.     About five minutes later, Operations Manager Lloyd Hughes walked into the control room and asked Plaintiff if Mr. DiBari had seen his coffee cup in the horseshoe. Plaintiff responded that Mr. DiBari had seen it. Then, Mr. Hughes cussed at Plaintiff. He walked out the door cussing the whole way out. Plaintiff became deeply disturbed about what had happened and it got worse later in the day.

30.     Later that afternoon, Plant Safety Manager Mike Gallaher came into the control room to discuss what had happened earlier. He talked to Plaintiff for about twenty minutes and then left.

31.     At approximately 4:30 p.m., Mr. DiBari came back into the control room to talk to Plaintiff. He told Plaintiff that he was a man of his word so he wanted to see if Plaintiff had called Mr. Hughes to offer him some of Plaintiff's "free bandwidth." Plaintiff told him that he had not because Mr. Hughes had got on to him for talking to Mr. DiBari not even five minutes after he had left the control room. Mr. DiBari replied, "Oh that? That's between you and Lloyd [Hughes]. We are just talking here," or words to that effect.

32.     Mr. DiBari stated that he had asked around about Plaintiff all day and that everyone responded the same about him. Plaintiff is very hard working, smart, reliable, dedicated, and caring. Then he said, "But we need to work on your professionalism." Then he began to question Plaintiff's professionalism and character.

33.     After he was finished insulting Plaintiff, Mr. DiBari asked him if he had any questions for him. Plaintiff asked him if the coffee cup issue was resolved and Mr. DiBari told him that it was Mr. Hughes' policy so he would have to take it up with him. Plaintiff told him that he had asked Mr. Hughes several times, and Mr. Hughes said the

policy had come from corporate. Mr. DiBari told him that they could talk about it because there was some room for debate over the rule.

34.     Then he leaned over close to Plaintiff and stated, "You do understand the chain of command don't you, Jeff?" Plaintiff responded, "I got you, brother." Then he turned away and Mr. DiBari left the room.

35.     Plaintiff felt threatened by the comment about the chain of command. After Plaintiff's shift was over, he left the plant as quick as possible. On his way home, he started throwing up and had to stop on the side of the road several times.

36.     From that point forward until Plaintiff's hospitalization, Plaintiff began experiencing severe sleeplessness and extreme weight loss. Plaintiff lost around fifty (50) pounds. Plaintiff continued having problems with throwing up from time to time, which started rotting the enamel of his teeth.

37.     On February 7, 2009, Plaintiff went into Mr. Hughes' office and apologized for any trouble he may have caused him with Mr. DiBari. Mr. Hughes responded that they would be talking about it later.

38.     Later that day, Plaintiff was called into Plant Manager Roy Sanchez's office with Operations Manager Lloyd Hughes present. Plaintiff was issued a letter of reprimand and placed on probation for six (6) months.

39.     Plaintiff was reprimanded for (1) having a coffee cup at his workstation; (2) internet usage; and (3) using profanity. The reprimand was clearly in retaliation for Plaintiff's comments to Mr. DiBari.

40.     Plaintiff should not have been reprimanded for having a coffee cup at his station because (a) Mr. DiBari himself placed a bottle of water next to Plaintiff's coffee

cup on the day in question; and (b) other employees routinely had drinks at their stations. Neither Mr. DiBari nor the other employees were written up.

41.    Plaintiff should not have been reprimanded for internet usage because (a) he did not violate company policy; (b) Plaintiff had asked his immediate supervisor Lloyd Hughes about internet usage in the past, and Mr. Hughes had told him explicitly that he could look at the internet so long as he did not access any offensive or pornographic sites and so long as it did not interfere with his work.

42.    Finally, Plaintiff should not have been reprimanded for using profanity because the reprimand states that Mr. DiBari was not offended by Plaintiff's language and because Mr. Hughes himself cussed Plaintiff out after Mr. DiBari left the control room.

43.    Plaintiff was upset by the reprimand.  Mr. Hughes and Mr. Sanchez told him not to worry about anything because it could have been worse:  "Dominic [DiBari] was saying we should cut your pay or your bonus because of this so just keep your nose clean for a few months and this will go away," or words to that effect.

44.    Plaintiff asked Mr. Hughes if he should get a lawyer or talk to human resources because this was blatant harassment.  Mr. Hughes and Mr. Sanchez quickly began backtracking and assured him that it was only probation, so he needed to relax.

45.    After this meeting, Plaintiff began to do some research to see if Defendant had violated any laws by their actions.  Plaintiff is a prolific writer who uses writing to channel his anger and bad emotions into words.  Plaintiff began writing a lengthy letter detailing the narrative of events to respond to his letter of reprimand.  Plaintiff also discussed the situation with some of his co-workers.

46.     Plaintiff let Mr. Hughes read part of his draft letter, and Mr. Hughes agreed that the events were accurate.  As Plaintiff finished writing the letter, Plaintiff decided to trash it and start over because he thought some of the events mentioned in the letter might reflect poorly on his supervisor Mr. Hughes and some co-workers, and he did not want to get anyone in trouble.

47.     Plaintiff started a new letter with an emphasis on the laws that he believed had been violated, and he again discussed some of the details with his co-workers and Mr. Hughes.

48.     During this time, Plaintiff had several conversations with Mr. Hughes about the incredible difficulties he was having.  During one of the conversations, on or about the morning of March 16, 2009, Mr. Hughes brought up the letter Plaintiff was writing.  Mr. Hughes said, "Dominic [DiBari] has heard about this letter you are typing and is asking me questions about what is in it."

49.     Plaintiff told him that he had trashed the letter he had showed Mr. Hughes and started over.

50.     Mr. Hughes responded, "Well, I'm going to tell you this.  If you do anything, say anything… you are going to get fired and my hands will be tied; and I will not do anything to help you," or words to that effect.

51.     Plaintiff asked him, "…if I still feel that Dominic [DiBari] harassed me I am not allowed to say a thing to defend myself or I am going to get fired?"  Mr. Hughes said, "I'm telling you that if you do anything, say anything… you are gonna get fired and I'm not gonna do a fucking thing to help you."  Plaintiff became severely worried and panic overtook him because Mr. Hughes had turned his back on him.

---

PLAINTIFF'S FIRST AMENDED COMPLAINT                                    PAGE 10

52.     Because of the conversation with Mr. Hughes in the morning, later that day, on March 16, 2009, Plaintiff sent an email to Defendant's Employee Solutions Group to file an internal workplace complaint.

53.     Plaintiff received a response from Robert Perez with Employee Relations HR Services.  Plaintiff talked with Mr. Perez at length on the phone.  Mr. Perez asked Plaintiff to write down what had happened, so Plaintiff emailed him the letter he had written.  Plaintiff acknowledged to Mr. Perez that the language in the letter was a bit harsh because it was written out of frustration.  Although addressed to Mr. DiBari, Plaintiff never sent the letter to Mr. DiBari.

54.     On or about March 18, 2009, Mr. Perez called Plaintiff and told him that an investigation needed to be conducted.  Mr. Perez informed Plaintiff that he needed to take off at the end of his shift through the entire time of the investigation and stay away from the plant.

55.     Plaintiff begged and pleaded not to be taken off shift.  Plaintiff told Perez that being taken off shift would be the worst thing for him and would have very bad consequences for his mental well-being.

56.     Perez insisted that Plaintiff was being taken off shift for the duration of the investigation.

57.     Before he left the plant, Plaintiff went to talk to his immediate supervisor, Mr. Hughes.  Plaintiff told Mr. Hughes that he had contacted human resources and they were going to conduct an investigation, so he had to take off during that time.  Mr. Hughes stated that he would call Mr. Perez.  Mr. Hughes told Plaintiff that he would be on paid leave and no vacation use would accrue.

58.     Plaintiff asked Mr. Hughes if he felt that Plaintiff had done the right thing and Mr. Hughes said that he did not.  Plaintiff asked him what he would have preferred him to do.  Mr. Hughes said, "I wish you would have taken him in the back room and had a talk with him and settled it like that."

59.     During the investigation, Mr. Perez called Plaintiff to come to corporate headquarters in New Jersey, so Plaintiff went.

60.     While in New Jersey, Plaintiff met with Robert Perez and Steven Fleischer for approximately five hours.  Mr. Fleischer did not identify his role with the Company. Plaintiff learned subsequently that Mr. Fleischer is Assistant General Labor & Employment Counsel for PSEG Services Corporation.   At some point, they asked Plaintiff what he wanted to make this go away.  Plaintiff he told them that he wanted an apology and to have the letter of reprimand removed from his file because he needed some assurance that he would not be fired for the next stupid little thing that might happen.

61.     After returning from his trip, Plaintiff sat at home for over a week going out of his mind.  Finally, Plant Human Resources Representative Ila Tatum contacted Plaintiff and told him that Defendant wanted him to undergo a psychological evaluation to determine his propensity for violence.  Ms. Tatum made it clear that Plaintiff's future employment depended on whether he complied with the request.

62.     On April 1, 2009, Ms. Tatum called Plaintiff again to inform him that he had to see the psychologist on April 8.  Plaintiff complied because he feared he would be fired if he did not, and went to the appointment.

63.     Plaintiff met with Psychologist Jarvis A. Wright, Ph.D., on April 8, 2009, and Dr. Wright performed a Fitness for Duty Evaluation.  In the evaluation report, Dr. Wright stated the following:

a.     "The current examination revealed nothing to suggest the employee presented an increased physical risk (compared to the general population) to himself or others at the workplace."

b.     "I do not recommend any additional assessment of the employee."

c.     "The employee states that he enjoys his work and wants to return to work."

d.     "I do not recommend time off from work."

e.     "The employee did not describe symptoms or demonstrate signs of mental disorder that would keep him from behaving appropriately in the workplace."

64.     Approximately two weeks passed after the evaluation with no word on the investigation.  Waiting took its toll on Plaintiff.

65.     On or about April 23, 2009, Plaintiff received a call from Mr. Perez informing him that the investigation was complete and Mr. Hughes would be calling him to go back to work.  Also, Mr. Perez told him that some things were done very wrong and the letter of reprimand would be removed from his file.  Mr. Perez also said that Mr. DiBari, Mr. Hughes, and Mr. Sanchez were going to receive coaching on how to discipline.

66.     Plaintiff told Mr. Perez that he wanted to have a sit-down with Mr. DiBari and his boss to clear Plaintiff's name and get an apology from Mr. DiBari.  Mr. Perez said, "Great idea. We can make that happen," or words to that effect.

67.     Plaintiff told Mr. Perez that Plaintiff was concerned about his fitness for duty because without an apology he would so worried about losing his job that he would be unable to perform the job.

68.     Plaintiff asked for a copy of the investigation as well as his personnel file, and Mr. Perez told him that he absolutely would not be allowed to see such things.

69.     On or about Saturday, April 25, 2009, Plaintiff received a late evening call from Mr. Hughes who told him that he should return to duty the following Thursday night.  Plaintiff told Mr. Hughes that he was struggling with what had happened to him over the last few weeks, but Plaintiff agreed to go back on shift as instructed.

70.     The next two nights, Plaintiff could not stop obsessing about the fact that he was being set up to fail.

71.     On Monday morning, Plaintiff called Mr. Hughes and told him, "I know I said I would go back on shift but I am in really bad shape here and I'm afraid I simply can't go back on shift until I have a sit-down and get my name cleared.  I can't focus and I need that apology first because I am afraid I will be too concerned with keeping my job and not doing it and that it is simply not safe.  I'm simply not fit for duty.  I need help here."

72.     Mr. Hughes replied, "Well, they aren't going to be happy with this at all."

73.     Late Tuesday evening, Mr. Hughes called Plaintiff back and told him that there would be no sit-down.  If he failed to report as scheduled on Thursday, he would be fired.  Mr. Hughes told Plaintiff that he could call Rick Machon, Mr. DiBari's boss, and gave him the number.

74.    Plaintiff called Mr. Machon on Wednesday, and asked to meet with Mr. Machon and Mr. DiBari.  Mr. Machon told Plaintiff that Mr. Machon would meet him the next time Mr. Machon was in town, but there would not be a "sit down" with Mr. DiBari. Mr. Machon stated several times, "I have read my summary.  There was no harassment. You will go back on shift, and you will be treated like everyone else," or words to that effect.

75.    Plaintiff reported to work on Thursday as instructed.  He was so nervous that he threw up on the way to work.  Nevertheless, he reported directly to Plant Manager Roy Sanchez's office as instructed.  Mr. Sanchez, Mr. Hughes, and HR Representative Ila Tatum (who had flown in from New Jersey) met with Plaintiff.  Mr. Hughes read word-for-word from a piece of paper, of which each of them had a copy.  Among other things, Plaintiff was told that the investigation was complete and that if he talked about the events to anyone else, both he and the other person would be subject to discipline.

76.    Plaintiff felt like he was being set up to fail.  He again stated his concerns about his fitness for duty, and he was asked if he was fit for duty.  Plaintiff responded that he was not, but he felt like he did not have a choice but to go back on shift so he would find a way to make it.

77.    After the meeting, Plaintiff asked both Mr. Hughes and Ms. Tatum for a copy of the paper from which Mr. Hughes read.  Plaintiff's request was denied.

78.    Plaintiff learned later that Mr. Hughes had called in the night supervisor and told him to go around and tell everyone not to talk to Plaintiff about anything that had happened to him in the last month or else they would be fired, and if there was talk

by Plaintiff to report it back immediately.  This decree had a chilling effect and served to isolate Plaintiff and subject him to increased scrutiny.

79.     Plaintiff shut the plant down that night without incident.  When the startup in the morning happened, one of Plaintiff's co-workers made a mistake that nearly tripped one of the generators.  Plaintiff froze and simply could not think of what he needed to do.

80.     From this point forward, Plaintiff would not work inside the plant control room.  He was unable to concentrate and it was getting worse.

81.     To make matters worse, Plaintiff was placed on a different shift under a different supervisor.  This supervisor is known to be volatile.

82.     On Saturday, May 9, 2009, Plaintiff was working overtime at the plant to support an outage for maintenance.  Plaintiff was having terrible difficulties doing his job.  Plaintiff told the shift supervisor Charlie Pando about what he was going through, and Pando reported it to Plant Manager Roy Sanchez.

83.     Plaintiff had already left for the day when he was called to return to the plant by Mr. Sanchez.  Plaintiff returned and met with Mr. Sanchez and Mr. Hughes.  Mr. Sanchez said that Plaintiff had expressed his concerns about his mental functioning to Mr Pando, and Mr. Sanchez asked Plaintiff if he was fit for duty.  Plaintiff told him that he had been saying for a considerable period of time that he was NOT fit and that he had been asking for help.  Plaintiff told Mr. Sanchez that he was having an extremely hard time, but that he would just have to slow down and make sure he got everything correct.  Mr. Sanchez suggested that Plaintiff come off shift again, but Plaintiff begged him not to

do that because Plaintiff knew that he would be strongly affected by being taken off work again.

84.    Plaintiff was off on Sunday.  Monday, May 11, 2009, was the first day of the new shift line ups.  While Plaintiff was making rounds, Mr. Hughes asked Plaintiff how he was doing.  Plaintiff told him he was not doing very well.  Plaintiff told him that he was under continuously growing stress due to the events of the previous months.  Mr. Hughes told Plaintiff he was trying to help him.  Plaintiff told Mr. Hughes that he had not supported Plaintiff, and asked Mr. Hughes to leave him alone.

85.    About an hour later, Plaintiff was called into Mr. Sanchez's office with Mr. Hughes and Mr. Hernandez present.  Mr. Sanchez told Plaintiff that he was being suspended from shift for the rest of the day for being disrespectful to Mr. Hughes.  Plaintiff begged them not to suspend him.  Plaintiff was also instructed to get another fitness for duty evaluation and be back Friday morning for his scheduled shift.

86.    Plaintiff went home and fell to the floor in a heap of sobbing, wailing tears.  After a while, he got his head together enough to start calling around looking for psychiatrists to help him, but no one could see him until late July or early August.  So he called Desert Springs, and was admitted to the BCA Hospital immediately because he was suffering from a nervous breakdown.

87.    On May 15, 2009, the morning he was supposed to be back at work, Plaintiff called Mr. Sanchez and notified him that he had been admitted at the hospital.  Mr. Sanchez told him that was all he needed to know and hung up the phone.

88.    On May 18, 2009, a conference call took place attended by Mark Reiken, Raymond Binetti, Robert Baldino, Steven Fleischer, Frank Romano, Dominic DiBari,

Lloyd Hughes, Roy Sanchez, and Ila Tatum.  It was decided to terminate Plaintiff's employment

89.     Plaintiff was discharged from the hospital on May 20, 2009.  When Plaintiff arrived at his house, he found a letter from Defendant terminating his employment for insubordination.  The letter was dated May 18, 2009.

90.     Plaintiff was shocked by this letter and it sent him back into the mental state he was in when he had went into the hospital.  The next morning FedEx delivered Plaintiff's personal belongings that had been unceremoniously dumped in two careless looking boxes.

### COUNT ONE – DISABILITY DISCRIMINATION (ADA)

91.     Plaintiff is an employee within the meaning of the ADA.  *See* 42 U.S.C. §12111(4).

92.     Defendant is an employer within the meaning of the ADA. *See* 42 U.S.C. §12111(5).

93.     Plaintiff is a qualified individual with a disability as defined by the Americans with Disabilities Act (ADA). *See* 42 U.S.C. §12102, 12111(8).  Plaintiff is otherwise qualified to perform the essential functions of his job as Shift Control Operator.

94.     Defendant violated the ADA by failing to accommodate Plaintiff's disability in the following non-exclusive ways: (a) taking him off shift; (b) changing his shift and supervisor; (c) failing to allow him a reasonable period of leave to return to work after his hospitalization.  In the alternative, Defendant intentionally discriminated against Plaintiff by firing him because of his disability.

95.     In the event that Plaintiff's condition is not a disability as defined by the ADA, Defendant regarded him as disabled and/or he has a record of disability.

96.     Defendant violated the ADA by (a) taking him off shift; (b) placing him on administrative leave; (c) requiring him to take a fitness for duty exam (which found him to be fit); (d) changing his shift and supervisor; (e) setting him up to fail; and (f) terminating his employment.

97.     To the extent that Defendant contends that Plaintiff was fired for insubordination or some other legitimate non-discriminatory reason, said reason is a mere pretext for discrimination.  Alternatively, the reason(s) given for Plaintiff's termination, while true, are only some of the reasons, and Plaintiff's protected activity was a motivating factor in the decision to terminate his employment.  In other words, Defendant had mixed motives for Plaintiff's termination.

98.     As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages.  Defendant's conduct was willful and justifies an award of punitive damages.

## COUNT TWO-ADA-RETALIATON

99.     Plaintiff is an employee within the meaning of the ADA.  *See* 42 U.S.C. §12111(4).

100.    Defendant is an employer within the meaning of the ADA. *See* 42 U.S.C. §12111(5).

101.    Plaintiff is a qualified individual with a disability as defined by the Americans with Disabilities Act (ADA). *See* 42 U.S.C. §12102, 12111(8).  Plaintiff is otherwise qualified to perform the essential functions of his job as Shift Control Operator.

102.    Plaintiff engaged in protected activity by filing an internal complaint alleging harassment by Dominic DiBari and making subsequent verbal complaints that he was unfit for duty because of Defendant's handling of the complaint.

103.    Defendant retaliated against Plaintiff in violation of 42 U.S.C. § 12203 by giving him a written reprimand on February 7, 2009; taking him off shift and placing him on administrative leave; requiring him to obtain a fitness for duty examination in April 2009 (which found him to be fit for duty); conducting an inadequate investigation of Plaintiff's complaint; changing his shift and supervisor; taking him off shift again; and ultimately terminating his employment.

104.    Defendant instructed Plaintiff not to talk about his complaint and instructed other employees not to talk to Plaintiff, thereby creating a chilling effect and subjecting Plaintiff to isolation and ridicule.

105.    To the extent that Defendant contends that Plaintiff was fired for insubordination or some other legitimate non-discriminatory reason, said reason is a mere pretext for discrimination.  Alternatively, the reason(s) given for Plaintiff's termination, while true, are only some of the reasons, and Plaintiff's protected activity was a motivating factor in the decision to terminate his employment.  In other words, Defendant had mixed motives for Plaintiff's termination.

106.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages.  Defendant's conduct was willful and justifies an award of punitive damages.

<u>COUNT THREE – TITLE VII –RETALIATION</u>

107.    Plaintiff is an employee within the meaning of Title VII. *See* 42 U.S.C. §2000e(f).

108.    Defendant is an employer within the meaning of Title VII. *See* 42 U.S.C. §2000e(b).

109.    Defendant intentionally discriminated and retaliated against Plaintiff by terminating his employment in violation of the opposition clause and/or the participation clause of Title VII, 42 U.S.C. § 2000e-3(a).

110.    Plaintiff engaged in protected activity by filing an internal complaint alleging discrimination including but not limited to reporting Plant Manager Roy Sanchez's comments about not hiring any white employees and/or hiring only Hispanic employees and Dominic DiBari's treatment of Plaintiff.

111.    Defendant retaliated against Plaintiff by giving him a written reprimand on February 7, 2009; taking him off shift and placing him on administrative leave; requiring him to obtain a fitness for duty examination in April 2009 (which found him to be fit for duty); conducting an inadequate investigation of Plaintiff's complaint; changing his shift and supervisor; taking him off shift again; and ultimately terminating his employment.

112.    Defendant instructed Plaintiff not to talk about his complaint and instructed other employees not to talk to Plaintiff, thereby creating a chilling effect and subjecting Plaintiff to isolation and ridicule.

113.    To the extent that Defendant contends that Plaintiff was fired for insubordination or some other legitimate non-discriminatory reason, said reason is a mere pretext for discrimination. Alternatively, the reason(s) given for Plaintiff's termination, while true, are only some of the reasons, and Plaintiff's protected activity was a motivating factor in the decision to terminate his employment. In other words, Defendant had mixed motives for Plaintiff's termination.

114.    As a direct and proximate result of Defendant's conduct, Plaintiff suffered damages.  Defendant's conduct was willful and justifies an award of punitive damages.

COUNT FOUR - FMLA

115.    Plaintiff is an eligible employee under the Family and Medical Leave Act (FMLA.)  Specifically, Plaintiff was employed by Defendant for at least 12 months and worked at least 1,250 hours in the twelve months preceding his need for leave.  28 U.S.C. § 2611(2).

116.    Defendant is an employer under the FMLA.   Specifically, Defendant employed 50 or more employees for each working day of 20 or more calendar workweeks in the current or preceding calendar year. 28 U.S.C. § 2611(4).

117.    Plaintiff was hospitalized for one or more serious health conditions, as defined by 28 U.S.C. § 2611(11), namely Major Depressive Disorder (Severe without Psychosis), Generalized Anxiety Disorder, Obsessive Compulsive Disorder, and/or Post Traumatic Stress Disorder.

118.    Plaintiff was entitled to leave under the FMLA.  Plaintiff was entitled to be reinstated to a comparable position at the conclusion of his leave, which would have been approximately one week.

119.    Plaintiff was unable to foresee the need for leave at the time he was hospitalized, however, he notified Defendant as soon as practicable by telephoning Plant Manager Roy Sanchez on the morning of May 15, 2009, the day he was scheduled to return to work.  A reasonable employer would have understood Plaintiff's call as a request for leave.

120. Defendant willfully violated the FMLA because Defendant knew that Plaintiff was hospitalized at the time of his termination or showed reckless disregard for whether or not its conduct was prohibited by the FMLA.

121. Plaintiff suffered actual damages in the form of lost wages, salary, and employment benefits. Plaintiff is entitled to interest calculated at the prevailing rate.

122. Plaintiff is entitled to an award of liquidated damages in an amount equal to actual damages pursuant to 29 U.S.C. § 2617(1)(B).

## CORPORATE LIABILITY

123. PSEG Texas and its parent company PSEG constitute a "single integrated enterprise" based on the following four factors: (1) interrelation of operations; (2) centralized control of labor relations; (3) common management; and (4) common ownership of financial control.

## DAMAGES

124. Plaintiff was discharged from employment. Although he has diligently sought other employment, he has been unable to find a job with comparable pay and benefits. In addition, Plaintiff has incurred expenses in seeking other employment. Plaintiff suffered damage to his pension or retirement benefits. Plaintiff seeks compensation for all back pay and lost wages and benefits. Reinstatement to Plaintiff's previous position is impractical and unworkable. Therefore Plaintiff seeks an award of front pay and future lost wages and benefits. Plaintiff suffered mental anguish and emotional distress.

## ATTORNEY'S FEES

125.    Plaintiff was forced to engage counsel to protect his rights.  Plaintiff is entitled to an award of attorney's fees and costs (including but not limited to an award of reasonable expert witness fees), both trial and appellate, under Title VII, 42 U.S.C. §2000e-5(k), the ADA, 42 U.S.C. §12205, and/or the FMLA, 29 U.S.C. §2617(a)(3).

## INTEREST

126.    Plaintiff is entitled to prejudgment and post judgment interest at the highest lawful rate.

## PRAYER

WHEREFORE, Plaintiff respectfully prays for judgment against Defendant for the following:

a.   Compensatory and punitive damages;

b.   Back pay and front pay;

c.   Attorney's fees and costs;

d.   Prejudgment and post-judgment interest;

e.   Such other and further relief, at law or in equity, to which Plaintiff may show himself justly and lawfully entitled.

Respectfully submitted,

By:_____

Holly B. Williams
Texas Bar No. 00788674

---

PLAINTIFF'S FIRST AMENDED COMPLAINT                                    PAGE 24

**WILLIAMS LAW FIRM, P. C.**
1209 W. Texas Avenue
Midland, TX 79701
432-682-7800; 432-682-1112 (fax)
holly@williamslawpc.com

**ATTORNEY FOR PLAINTIFF
JEFFREY NEELY**

PLAINTIFF DEMANDS A TRIAL BY JURY.

---

PLAINTIFF'S FIRST AMENDED COMPLAINT                                    PAGE 25